## Teicher Unemployment Compensation Case.

Argued October 6, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*David R. Perry,* Special Deputy Attorney General, with him *James H. Duff,* Attorney General, for appellant.

*R. Carlyle Fee,* Asst. Special Deputy Attorney General, with him *James H. Duff,* Attorney General, and *Charles R. Davis,* Special Deputy Attorney General, for appellee.

OPINION BY KENWORTHEY, J., January 27, 1944:

Claimant in this unemployment compensation case was married June 29, 1941. In October 1941, she accepted employment as a saleslady with Lane Bryant, Inc., Philadelphia. Her husband was then a student at the Pennsylvania School of Social Work in Philadelphia. On May 29, 1942, she voluntarily quit her employment and went with her husband to reside in New York, where he became employed by the National Refugee Service. On September 24, 1942, he entered the Armed Forces of the United States and was sent to Camp Claiborne, Alexandria, Louisiana, for training. On September 27, 1942, three days after his induction, claimant accepted employment as a saleslady with the Macher Watch Company in New York. On November 18, 1942, she again voluntarily quit her employment and moved to Alexandria to live with her husband during his training period. As late as January 27, 1943, she was apparently still in Alexandria. How long after that date she remained does not appear.

The referee and the board held claimant was eligible for compensation.[1]

---

[1] Claims No. 5 (revised June 1, 1943), Par. 4(b), promulgated in accordance with §312 of the Act of December 5, 1936, Second Ex. Sess. P. L. (1937) 2897, art. III, added 1942 Ex. Sess. April

The purpose of the Unemployment Compensation Law (Act of December 5, 1936, Second Ex. Sess. P. L. (1937) 2897, as amended 1942, Ex. Sess., April 23, P. L. 60, 43 PS §751 et seq.), as stated in section 3 of article I,[2] is to alleviate the burden upon the unemployed worker, and ultimately upon the commonwealth in the form of poor relief assistance, resulting from indigence due to involuntary unemployment through no fault of the employee. With exceptions not material here, until the Amendment of 1942 (Act of April 23, 1942, Ex. Sess. P. L. 60, §4, 43 PS 802), the *only* employees eligible for compensation were those who lost their employment involuntarily. By the Amendment, eligibility was extended to include those who voluntarily quit *with good cause.*[3]

It must be conceded that claimant voluntarily quit. The first question is whether she quit with good cause. The second question is whether, during the weeks for which the compensation is sought, she was "available for work" (Section 401(d) ) within the meaning of the act. We shall assume, for present purposes, that she has complied with all of the other requirements of eligibility.

Because of the tendency, under the circumstances of this case, of the two questions—whether claimant quit

---

23, P. L. 60 §4, 43 PS §792, now reads: "In case an interstate claimant is qualified for benefits under the unemployment compensation laws of two or more States other than the one in which he files his claim, his claims for benefits shall be forwarded to such States successively, and his benefits shall be paid by such States successively, in the same chronological order as the earliest dates on which the worker earned benefit credits currently available to him under the respective laws of such States."

[2] 43 PS §752.

[3] The applicable language of section 402(b), 43 PS §802, is: "An employe shall be ineligible for compensation or waiting period credit for any week ...... (b) In which his unemployment is due to voluntarily leaving work without good cause:"

with good cause and whether she is available for work—
to merge or intermingle, it will simplify our consider-
ation of the first —whether she quit with good cause—
to consider it separate and apart from the second.

What did the legislature mean by "good cause?"

We are clear that it did *not* mean that the "good
cause" must be one arising out of or connected with the
employment. Additional language expressly so re-
stricting the expression is contained in the statutes of
a number of states.[4] It is plain to us that, if our
legislature had intended a similar restriction, it would
have said so. Causes which are purely personal are,
therefore, permitted. It is more than likely that the
Amendment, following closely upon our decision in the
*Bush* case,[5] indicates an intention on the part of the
lawmakers to broaden the act so as to cover cases in
which voluntary unemployment is caused by illness.
This would not mean, as at first blush it might seem,
that the law would become a sickness insurance law;
the additional requirements for eligibility would pre-
vent compensation during the period of illness and
until, after recovery, the requirements of eligibility
are met.

Judicial interpretation of words as elastic as 'good'
always presents serious difficulties. But, if we reach
the point of agreeing that the legislature intended to
include causes which are purely personal to the em-
ployee and not directly connected with the employment,
bearing in mind the other safeguards against uncon-
trolled exploitation, it is difficult to conceive of a cause
more impelling, more humanly justifiable, than the im-
pulse which induces a devoted wife to spend with a
husband, who is a member of the Armed Forces in

---

[4] 1 C. C. H. Unemployment Insurance, Par. 1975; *Ex Parte
Alabama Textile Prod. Corp.*, 242 Ala. 609, 7 S. (2d) 303.

[5] *Labor & Industry Dept. v. Unemployment Comp. Bd. of Rev.*,
133 Pa. Superior Ct. 518, 3 A. (2d) 211,

time of war, what may prove to be the last days they shall ever be together on earth.  In the opinion of a majority, the evidence supports the finding of the board that she did not voluntarily quit without good cause.[6]

But this court is unanimously of opinion claimant is not, or was not at the time of the application, ready for the benefits of the act.  However justifiable the reasons for quitting may have been, she was not "available for work."

There is at the present time, and has been throughout the period involved, a shortage of manpower in industrial employment, both in industries of a civilian nature and those engaged in the production of goods for war.  The situation has reached a point where employers have been compelled to resort to appeals for employees by unprecedented devices and means.  This is not only true in the largest metropolitan areas, such as Philadelphia and New York, but in innumerable smaller industrial communities.  When claimant voluntarily, though for good cause, removed herself from the labor market to join the wives and families of other soldiers at an army post, she deliberately became unavailable for work and, in our opinion, will remain so until she returns to a community in which a reasonable opportunity for work normally exists.  She quit not only her employment, but all the existing areas of reasonable opportunity for employment and isolated or insulated herself from innumerable employers crying for the need of available employees.  It would be unreasonable to impose upon Pennsylvania employers and employees the burden of paying her unemployment compensation while she remains there.  We think the legislature never intended such interpretation.

---

[6] Compare *Woodmen of the World Life Ins. Soc. v. Olsen,* 141 Neb. 776, 4 N. W. (2d) 923; *Ex Parte Alabama Textile Prod. Corp.,* supra; *Schwob v. Huiet,* 2 C. C. H. Unemployment Insurance, Par. 8141 (Ga.).

This is not to say that an unemployed person in a particular locality must pull up his roots and travel many hundreds of miles to available employment or suffer ineligibility if he refuses. The community may be said to owe a duty to a member who becomes unemployed through no fault of his own which is not fulfilled by requiring him to leave his established home and residence to take employment elsewhere. But here, the claimant was the actor. In our opinion, the duty of the community is temporarily lost or suspended when the member voluntarily removes to another in which there is no employment available and no reasonable expectation of finding any.

Decision reversed.

President Judge KELLER and Judge BALDRIGE agree with the opinion on the second point involved and therefore concur in the judgment.