Sturdevant Unemployment Compensation Case.

550

Argued October 22, 1945. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Isaac J. Silin,* with him *Brooks, Curtze & Silin,* for appellant.

*R. Carlyle Fee,* Assistant Special Deputy Attorney General, with him *Charles R. Davis,* Special Deputy Attorney General and *James H. Duff,* Attorney General, for appellee.

OPINION BY RENO, J., March 5, 1946:

This is an appeal by the employer from the decision of the Unemployment Compensation Board of Review. The bureau determined that the claimant was eligible for compensation. Upon the employer's appeal, the referee reversed the bureau and denied benefits. The board, on its own motion, reviewed the referee's decision, reversed it, and allowed the claim.

The board's findings of fact are supported by the evidence, and are binding upon us. Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, §510, 43 PS §830. They will be stated compendiously.

Mabel Sturdevant was employed from June or July, 1942, until December 15, 1943, as a skilled lathe operator by appellant which was manufacturing radio parts for the United States Army. On December 2, 1943, she procured a leave of absence until December 15, 1943, to visit her husband in the armed forces near Columbia, S. C. On December 14, 1943, she wrote to her employer from Columbia that she wished to stay with her husband

until the middle of January, 1944, and on December 20, 1943, she again wrote that her husband was in a hospital where he would be confined for 30 days and that she would remain with him until he was discharged from the hospital, when both would return to and remain at home during his ensuing furlough.

She registered for work in Columbia, a city of 110,000 population, with textile mills, department stores and government offices as the principal employers. She stated that she was available for a 30 day period only. She was referred for work packing doughnuts but the referral employer, desiring a permanent employe, declined to employ her. On February 29, 1944, she returned to appellant's employ where she was assigned to lighter work because of her pregnancy.

Here and below, appellant contended that (1) claimant had voluntarily quit her employment without good cause, (2) was not available for employment, and (3) that the 1943 amendments providing for contributions based upon merit rating require that "good cause" be restricted to causes arising out of the employment.

I. Appellant's first contention calls for the construction of the phrase "without good cause", inserted into §402 (b), 43 PS §802, of the Unemployment Compensation Law by amendment in 1942. The section as amended follows: "An employe shall be ineligible for compensation or waiting period credit for any week . . . (b) In which his unemployment is due to voluntarily leaving work without good cause: Provided, That no employe shall be deemed to be ineligible under this section where as a condition of continuing in employment such employe would be required to join or remain a member of a company union or to resign from or refrain from joining any bona fide labor organization, or to accept wages, hours or conditions of employment not desired by a majority of the employes in the establishment or the occupation, or would be denied the right of collective bargaining under generally prevailing conditions."

The statute, almost ten years old, introduced into our law a new concept of social obligation, extended the police power of the State into a virgin field, and created a body of rights and duties unknown to the common law. England was the first common law country to operate a similar system, and its experience began as an experiment in 1911.[1] Its law, revised as trial exposed error, became the basis for the American unemployment compensation system, although in detail there are vast variances between the American and British systems. Wisconsin passed an act in 1932, but it required the enactment of the Social Security Act by Congress on August 14, 1935 (49 Stat. 635, 42 USCA §901), to induce other states to adopt the system. All of the states have enacted conforming legislation, and their statutes include the basic requirements laid down by the Act of Congress, but they differ widely and sharply in respect to the details which Congress left open to state legislation.

The administration of the laws is committed to agencies designated or organized by each state, over which the federal Social Security Board exercises advisory and supervisory functions. The agencies, state and

---

[1] In 1938 the Social Security Board published "Benefit Decisions of the British Empire; A Codification and Text of Selected Decisions." The volume contains 759 decisions by the Umpire under the British unemployment insurance acts. They were selected with special reference to the problems created by provisions in the various American acts, and have provided the foundation for much of the administrative law on the subject. The administration and judicial interpretation of the unemployment compensation legislation have proceeded according to the Anglo-American concept of law and justice. Some of the rules and principles discussed in this opinion, and the rationale which supports them, have been drawn from the British Decisions without specific citation. In the absence of persuasive judicial interpretations and decisions, consideration has been given, in the preparation of this opinion, to the collection of the American administrative rulings described in note 2, infra, whenever they have been deemed expository of, and relevant to, the provisions of the Pennsylvania statute.

federal, have produced an immense and impressive body of decisional law, but so far comparatively few of the many vital questions arising out of the legislation have been presented to judicial scrutiny.[2] Until more cases involving a wide variety of factual situations have been brought to the courts, judicial answers will necessarily lack the usual rigor of legal formulas, and tend to be tentative and groping in their nature. Concrete cases will develop general principles, and precise definition will issue from the wisdom acquired by greater experience.

But even now, in the dawn of judicial interpretation, we can rule, with confidence in the validity of our judgment, that "good cause", as it stands in the statute since 1942, includes the causes specified in the act, and other causes attributable to or connected with the work, without however excluding personal reasons or, as they are sometimes called, extraneous factors. We reach that conclusion, not alone by a literal interpretation of the whole act, and by reflection upon its objectives, but also by consideration of the circumstances in which the 1942 amendment was enacted. The legisla-

---

[2] The Social Security Board reports selected and illustrative opinions and decisions of the various state administrative agencies relating to the allowance of employe-benefits in a monthly publication called "Unemployment Compensation Interpretation Service: Benefit Series." In the nine years since the unemployment compensation became effective it has reported over 10,000 cases. It has also reported the opinions of the appellate courts, but they are small in number. During the same period this court passed upon approximately 12 benefit cases, excluding those decided this day, and only one of them reached the Supreme Court. During one year, 1945, the Pennsylvania Board of Review adjudicated 1504 benefit claims. These figures indicate that unemployment compensation laws have been largely interpreted at the administrative level. During the first nine years of the analogous Workmen's Compensation Act, the Supreme Court decided 156 and the Superior Court 58 cases. No count can be made of workmen's compensation cases decided by common pleas courts during that period and which were not appealed to the appellate courts.

tures of a minority of the states were then engaged in a process of "tightening up" disqualification provisions by requiring that "good cause" be "connected with the work" or "attributable to the employer", thereby eliminating purely personal reasons for leaving work from the "good cause" category. At that juncture, Governor James called a special session of the General Assembly, and by his supplemental proclamation of February 17, 1942, designated *"Liberalization* of the Unemployment Compensation Law" as one of the subjects for its consideration. P. L. (1942), p. 5. (Italics supplied). Responding to the call for liberalization, the General Assembly, with the amended laws of other states before it, rejected similar restrictive provisions and wrote into the law the broad and unlimited phrase, "without good cause". These circumstances justify the conclusion that the General Assembly deliberately chose to enact into law purely personal reasons as good cause, and a majority of this court announced that conclusion in *Teicher Unemployment Compensation Case,* 154 Pa. Superior Ct. 250, 35 A. 2d 739.

That opinion was filed January 27, 1944; a regular session of the legislature met in 1945; it enacted many important amendments to the law, among them an amendment to this very section; and, although the legislature must be presumed to have known that we had differed in our views concerning the meaning of the 1942 amendment, it did not touch or alter the "good cause" language of that amendment. We must conclude that the legislature intended that the construction of the majority should stand as the correct expression of the legislative will. When a section of an act is amended, the amendment and the original unamended portion of the section are to be read together and viewed as one law passed at one time. Statutory Construction Act of May 28, 1937, P. L. 1019, §73, 46 PS §573. So, the 1942 amendment to §402 (b), supra, and the 1945 amendment, although they became effective at different dates,

must be read as though the whole section as amended had been enacted in 1945. And the repetition of the language of the 1942 amendment in the 1945 amendment, without alteration or amendment, indicates the intent of the 1945 legislature to adopt the judicial construction of the language of the 1942 amendment. Id., §52, 46 PS §552.

Of course, "good cause" and "personal reasons" are flexible phrases, capable of contraction and expansion, and by construction, all meaning can be compressed out of them or they may be expanded to cover almost any meaning. Reducing them to a fixed, definite and rigid standard, if desirable, is necessarily difficult, if not impossible. However, in whatever context they appear, they connote, as minimum requirements, real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith.

When related to the context of the statute, "good cause" takes on the hue of its surroundings, and it, and "personal reasons", must be construed in the light reflected by its text and objectives. The purpose of the act, declared by §3, is to relieve economic insecurity due to "involuntary unemployment". Yet selection of *involuntarily* unemployed workers is accomplished by means of several eligibility and disqualification provisions, and the provision under review provides benefits for employes who *voluntarily* leave employment with good cause. Thus the legislature enacted, paradoxical as it may seem, that an employe who voluntarily leaves his work with good cause is involuntarily unemployed.

"Voluntarily" and "involuntarily" are antonymous and therefore irreconcilable words, but the words are merely symbols of ideas, and the ideas can be readily reconciled. Willingness, wilfulness, volition, intention reside in "voluntarily", but the mere fact that a worker

wills and intends to leave a job does not necessarily and always mean that the leaving is voluntary. Extraneous factors, the surrounding circumstances, must be taken into the account, and when they are examined it may be found that the seemingly voluntary, the apparently intentional, act was in fact involuntary. A worker's physical and mental condition, his personal and family problems, the authoritative demand of legal duties,— these are circumstances that exert pressure upon him and imperiously call for decision and action.

When therefore the pressure of real not imaginary, substantial not trifling, reasonable not whimsical, circumstances *compel* the decision to leave employment, the decision is voluntary in the sense that the worker has willed it, but involuntary because outward pressures have compelled it.[3] Or to state it differently, if a worker leaves his employment when he is compelled to do so by necessitous circumstances or because of legal or family obligations, his leaving is voluntary with good cause, and under the act he is entitled to benefits. The pressure of necessity, of legal duty, or family obligations, or other overpowering circumstances and his capitulation to them transform what is ostensibly voluntary unemployment into involuntary unemployment.

When we approach the problem of a married woman who leaves her work to join her husband we realize immediately that we are in the presence of a compulsion which readily supplies a personal reason and a good cause. Under our law, it is the legal right of the husband to select the marital domicile and it is the legal duty of the wife to reside with him. Hence, when a husband moves the marital domicile to a distant point where he secures work and his wife voluntarily leaves

---

[3] It is familiar law that an ostensibly voluntary confession may be found to be in fact involuntary when the circumstances in which it was made are examined. The pressure of promises, threats, force, the third degree, etc., transform the seemingly voluntary act, and certainly an intentional act, into an involuntary act.

her work to accompany him, her compliance with the duty which the law casts upon her satisfies the requirements of "good cause".

On the other hand, joining a husband at a distant point may not always constitute good cause for a wife's leaving her employment. Obviously, a wife joining her husband who is enjoying an extended vacation, would not be justified in leaving her employment, unless perchance a serious illness required her attendance upon him. A husband may take a temporary or transient job in another locality without changing the marital domicile; in that case, no other circumstances appearing, a wife would not be justified in leaving her employment. The nature of the circumstances in each individual case, the strength and the effect of the compulsive pressure of external and objective forces must be evaluated, and if they are sufficiently potent, they become relevant and controlling factors.

Thus, resting our judgment entirely upon the circumstances, the conditions produced by the war, the maintenance of the morale of the army and civilians, the call to sacrifice and patriotism, we held that the claimant in the *Teicher* case, supra, was justified in leaving her employment to reside near her soldier-husband until duty called him elsewhere, although he had not established the marital domicile at the army post. Those unusual circumstances dictated the decision, and invested it with validity.

The instant case presents the same problem, and the decision must, for the reasons stated, be the same. The facts strikingly illustrate and emphasize what we have been saying. The claimant was a war-worker, engaged in the manufacture of essential war materials for the army. To leave her work and join her husband required a perplexing choice between conflicting pressures, the call of her country to remain on her vital job, and the duty to her husband. Appellant argues that she should have continued in the patriotic service for

which she had been trained. But in the circumstances she was obliged to make the decision, and her surrender to the compulsion of her legal obligations provided the good cause which justified the voluntary relinquishment of the employment.

It must be understood, and at this point we must underline it, that a determination that an employe has left his employment voluntarily with good cause does not of itself entitle the employe to compensation benefits. He must also meet the availability-for-work test provided by the statute. In many, probably in most, instances, the same cause that justifies an employe in leaving an employment will also prevent him from working, and disqualify him from receiving benefits. For instance, an employe who leaves employment because of ill-health: if his illness is severe enough to justify a voluntary leaving of employment, his illness will also, unless he speedily recovers or is readily adaptable to work of another type, justify a finding that he is not able to work.

II. Appellant's second contention contests claimant's availability for employment. Her relinquishment of a steady job for which she had been trained and in which she had acquired skill, leaving an employer who keenly desired to retain her services, moving to a locality where there were no demands for her particular skill, and where she was available for only temporary employment,—these facts form the basis for the contention.

The Unemployment Compensation Law is remedial, humanitarian legislation of vast import. Its benefits sections must be liberally and broadly construed. It is primarily intended for the benefit of unemployed workers. Consequently, the cardinal principle under which the act is administered is that an employe in covered employments can be denied its benefits only by explicit language in the act which clearly and plainly excludes him. *McFarland v. Unemployment Compensation Board*

*of Review,* 158 Pa. Superior Ct. 418, 45 A. 2d 423. Presumably, an unemployed worker in a covered employment is entitled to benefits, and loses them only when he falls under the condemnation of a disqualifying provision of the act, fairly, liberally and broadly interpreted.

The act provides (§401, 43 PS §801) : "Compensation shall be payable to any employe who is or becomes totally unemployed . . . and who . . (b) Has registered for work at a designated employment office, . . . (d.) Is able to work and available for work . . ." [4] The basic purpose of these requirements is to establish that a claimant is actually and currently attached to the labor force, just as the wage-credit provision (§401 [a]) assures the payment of benefits only to claimants who have a prior record of attachment to the labor force. Registration for work is the first requirement, and ordinarily it will be presumed that a claimant who registers is able and available for work. By registering the claimant makes out a prima facie case of availability, which is of course rebuttable by countervailing evidence, e.g., refusal of referred work, illness, inability due to superannuation, and other conditions.

There is no requirement in the quoted section, nor elsewhere in the act, that a claimant shall be available for work in any particular place, such as the locality in which he earned his wage credits or where he last worked or resided. The mere fact that a claimant has moved

---

[4] The Act of May 29, 1945 (No. 408), amended the Act of 1942, supra, and §401 (d) now reads: "Is able to work and available for *suitable* work." (Italics supplied). Thus, the availability provisions must be read in connection with the suitable work definition which was formerly contained in §4 (r). The suitable work definition is now provided by a new section (§4 [t]), and the definition has been considerably expanded. To what extent, if any, these amendments affect the expressions in this opinion, we have not considered. The new section also provides information as to some of the many factors which are considered by administrative agencies in determining the availability of a claimant.

from one locality to another does not create a basis for holding him unavailable for work. If he registers for work in the new locality, and labor-market conditions there afford reasonable opportunities for work, he is available for work. Even if it appears that he might more readily have been employed had he remained in his former locality, he is nevertheless available for work if he is willing to take work for which opportunities exist in the new locality.

Nor does our statute, differing in this respect from those of other states, require that the employe shall be available for full-time work, or for permanent, as distinguished from temporary, employment. So long as the claimant is ready, willing and able to accept some substantial and suitable work he has met the statutory requirements. By the same token, the availability rule does not necessarily require that a claimant be available for his most recent work or his customary work. It is sufficient if he is able to do some type of work, and there is reasonable opportunity for securing such work in the vicinity in which he lives. So, an unemployed worker is not justified in refusing part-time or temporary work, nor work for which he has not been trained but which he is able to perform. Conversely, a worker who is ready, willing, and able to accept part-time or temporary employment or employment not in line with his prior work or training cannot be classified as unavailable.

The determination of availability is not wholly an administrative function, but it is largely a question of fact. Some aspects of the question, e.g., the conditions in a given labor market, the ability of a worker to perform specified types of work, the time or work-shift which is most suitable for him, and many similar matters, are certainly pure questions of fact. Many integrants enter into the calculation, some resting on testimony, others upon specialized data and information peculiarly accessible to administrative agencies, and of which they may take official notice just as a court may

take judicial notice. Of course, such information should be placed upon the record, and the parties apprised of it, so that the essentials of a fair hearing are preserved. Our examination of the record in contests concerning availability must ordinarily be limited to the determination whether the board's findings of fact are sustained by the evidence. And following familiar principles, upon an appeal to us, a claimant, whose claim has been sustained by the board, is entitled to the benefit of all the evidence in his favor and the reasonable inferences that may be drawn from it.

The board's findings of fact reveal a claimant who registered for work, was ready, willing and able to accept work within the circumstances in which she was placed, and had not detached herself from the labor force. The findings are supported by the evidence; the conclusions follow firmly established administrative principles of adjudication; and the principles are sustained by the letter and intent of the statute. We shall not disturb the board's decision.

III. Finally, appellant argues that the adoption of the merit or experience rating system in 1943 amended or at least modified the "good cause" provision. The argument is that since the employer's contributions are now partly measured by his employment record, he should not be charged with unemployment not attributable to his fault, and that decisions which recognize personal reasons as good cause should be overruled.

The Unemployment Compensation Law was enacted to relieve the tragic distress caused by the 1929 cyclical business depression. But unemployment, for many reasons, is a continuing problem in the modern industrial state, and even in normal periods it must be met with a continuing program.[5] The act therefore provides alleviation for workers who are unemployed by the thrust and play of economic forces and also for unemployment

[5] See "Unemployment Compensation: What and Why", published by Social Security Board, 1938.

not directly or solely attributable to economic or depressional causes. The capital objective of the legislation is the alleviation of the distress of the individual worker, and this is accomplished by providing a fund out of which money benefits may be paid to eligible individuals. A secondary aim is the actual reduction of unemployment by providing incentives, in the form of reduced taxes, for the stabilization of employment by individual employers. But the secondary aim cannot control or limit or restrict the primary objective. The primary objective must dominate the secondary aim.

The General Assembly recognizes that the same statute may express the legislative will that one objective may be attained by several ways or means. Accordingly, it has provided that "the provisions [of the act] imposing taxes" shall be strictly construed, and: "All other provisions of a law shall be liberally construed to effect their objects and to promote justice": Statutory Construction Act of May 28, 1937, P. L. 1019, §58, 46 PS §558. That clear mandate prohibits us from limiting the benefit features of the act by its taxing provisions. The benefit section must be construed liberally, and they cannot be restricted or in any way affected by the operation of the strictly construed taxing provisions.

It must be recognized, too, that the employer's individual employment record is not the sole measure of his contribution. The rate is a compound of the individual employer's record, the record of all other employers of covered employment in the state, and the safety factor which assures an adequate balance in the fund.[6] This furnishes the answer to appellant's com-

---

[6] The Act of May 26, 1943, P. L. 639, 43 PS §781, which provided for the merit rating system was amended by the Act of May 29, 1945, (No. 408). Both acts sanction merit rating upon the basis of the three factors mentioned in the opinion, and both are temporary measures. By their terms, they expire at "the end of the calendar year in which occurs the beginning of the first regular session of the legislature which meets after the President of the United States declares that the present state of war no longer exists." It is incredible

plaint that his employment record is affected, and that he may be penalized in higher taxes, by claimant's marriage, an incident beyond his control and not attributable to the employment provided by him. He is also affected by other conditions beyond his control, among them the employment records of all the employers in the state. These may also affect him adversely, and cause the incidence of the tax to fall more heavily upon him. Differing from the scheme followed by several states, Pennsylvania operates a pooled-fund for unemployment compensation, and under that system the experience of one employer can be given only limited effect. Since his risk of unemployment is shared and insured by all his fellow-employers, appellant's experience in one instance or several instances and his allegation of a purely speculative increase in his tax, cannot be made the basis for disturbing the benefit sections of the act.

Decision affirmed.

that the legislature intended that a *temporary* rate should indirectly, and without specific amendment, modify other portions of the act.