Dawkins Unemployment Compensation Case.

Sun Shipbuilding and Dry Dock Company, Appellant, *v.* Unemployment Compensation Board of Review.

Argued November 24, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John D. M. Hamilton*, with him *Harold Scott Baile* and *Pepper, Bodine & Stokes*, for appellant.

*Roland M. Morgan*, with him *T. McKeen Chidsey*, Attorney General, and *Charles R. Davis*, Special Deputy Attorney General, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 5, 1948:

This is the question to be decided: Is an individual who voluntarily resigns from his employment in order to go into business for himself as an independent contractor entitled to unemployment benefits upon the unsuccessful and involuntary termination of his private business venture? The Unemployment Compensation Board of Review and the Superior Court of Pennsylvania answered this question affirmatively.

Perkins Dawkins, claimant, was employed by the Sun Shipbuilding & Dry Dock Company, Chester, Pa., as a third-class sheet metal worker from October 20, 1942 until August 4, 1945, when he left appellant company's employ in order to engage in business for himself as a roofer. Claimant noted the following reason on his official separation slip: "Quit, going into business for myself." From the date of his separation, claimant conducted a business as a roofing contractor, making about $35 per week, and he continued his private business until November 1945, when he was forced to give it up because he could no longer secure necessary materials for carrying on his work.

The record establishes that on August 30, 1945, Dawkins filed a claim for unemployment benefits with his local unemployment compensation office. On that date claimant's "benefit year" began, his "base year" being the calendar year of 1944. The Bureau of Unemployment Compensation rendered a decision on December 7, 1945, declaring that claimant met all the requirements of the Unemployment Compensation Law and was therefore eligible to receive benefits. The Sun Shipbuilding & Dry Dock Co., Dawkins' base year employer, appealed from this decision and the case was referred to a Bureau Referee, who on February 27, 1946, conducted a hearing. In testifying at that time, Dawkins told how he had reached a decision to resign from his employment with appellant company, as follows:

". . . the war was over and I hadn't been making any headway, I did some side work and I figured I could do better on the outside doing roofing. I came out to do work for myself, but I put in my resignation I didn't walk off the job. I gave them a whole month's resignation. . . . After the war was over I considered two things, first, my age and I figured I would probably be one of the first ones to go because I was 57 so I took that into consideration and between time I built up myself a nice little business."

The Referee concurred in the decision of the Bureau and affirmed its Findings of Fact, which consisted, inter alia, of the following: "2. A month previous to August 4th, 1945, claimant gave his employer notice that he was going to resign for the specific purpose of going into business for himself."

In his "Reasoning", the Referee made the following statements: "The Referee believes that this business of claimant's was a legitimate business and its failure to succeed was no fault of the claimant's and his separation therefrom can be construed as unemployed due to lack of work. The Referee must therefore conclude that claimant did not voluntarily leave his last place of employment without good cause within the meaning of the Law."

The appellant thereupon filed an appeal with the Unemployment Compensation Board of Review and on August 5, 1946, the Board of Review issued an order upholding the referee's Findings of Facts and Conclusion of Law awarding benefits to the claimant. The Board of Review stated: "On the basis of these Findings [which are "supported by the evidence"], the Referee properly concluded that the claimant cannot be disqualified under the provisions of Section 402(b) of the Law. The unemployment for which claimant seeks benefits was due to the failure of a business enterprise and not to voluntarily leaving work, and for this reason he

must be found eligible for benefits with respect to the provisions of the Unemployment Compensation Law."

A petition seeking "judicial review on the ground that the board erred in concluding as a matter of law that the claimant's act of voluntarily leaving his employment for the purpose of going into business for himself, constitutes 'good cause' within the meaning of the Unemployment Compensation Act" was filed by appellant with the Superior Court of Pennsylvania. A review was granted. The Superior Court sustained the decision of the Board of Review, saying, inter alia: "Under the definition, claimant clearly was *not* unemployed until his business failed. In the interim, between the date when he left his employment and the failure of his business, he was employed since he received *remuneration* for services rendered in his business."

Appellant contends that claimant was an "independent contractor" after he severed his connections with appellant company and not an "employe" within the contemplation of the Unemployment Compensation Act and thus was disqualified from receiving the benefits conferred by the act; that if claimant's "employe" status was not forfeited by virtue of his resignation, he was nevertheless ineligible for benefits under section 802 of the Act, 43 PS Supp., which reads: "An employe shall be ineligible for compensation for any week—(a) . . . (b) In which his unemployment is due to voluntarily leaving work without good cause . . ." As amended April 23, 1942, Ex. Sess., P. L. 60, sec. 4; May 21, 1943, P. L. 337, sec. 1; May 29, 1945, P. L. 1145, sec. 9. Effective June 1, 1945.

Apparently this case is sui generis. We find no case like it in either this or other jurisdictions. Our decision must be based on reasoning and not on authority.

The decision under review is based on the postulate that the "unemployment for which claimant seeks benefits was due to the failure of a business enterprise and not to voluntarily leaving work, and for this reason he

must be found eligible for benefits with respect to the provisions of the Unemployment Compensation Law". This rationale we do not accept. The initial question is: Was Dawkins an "employe" within the purview of the Unemployment Compensation Law? The Pennsylvania Unemployment Compensation Act defines "employe" as follows: " 'Employe' means every individual, whether male, female, citizen, alien or minor, who is performing or subsequent to January first, one thousand nine hundred thirty-six, has performed services for an employer in an employment subject to this act." 43 PS Supp. 753(i).

Dawkins while in the service of Sun Shipbuilding and Dry Dock Company was an "employe". But subsequently he changed his status from that of an employe to that of an "individual engaged in an independently established business".

At this point it is pertinent to quote certain sections of the Unemployment Compensation Act. Section 753 (1)(I) states: " 'Employment' means (i) all service performed prior to the first day of January, one thousand nine hundred forty-five, which was employment as defined in this section prior to the effective date of this amendment, and (ii) all service performed after the thirty-first day of December, one thousand nine hundred forty-four, which is employment as defined in this section as hereby amended . . . (2) The term 'Employment' shall include an individual's entire service performed within or both within and without this Commonwealth, if—(A) . . . (B) . . . 'An individual performing services for remuneration[1] in an employment subject to

---

[1] That remuneration means wages is clear from a consideration of the applicable section of the Act before its amendment. There it was stated ". . . An individual performing services for remuneration in an employment subject to this act shall be deemed to be performing such services for wages, unless and until it is shown to the satisfaction of the department that—(a) . . . (b) . . . (c) that such individual is customarily engaged in an independently established trade,

this act shall be deemed to be performing such services for wages, unless and until it is shown to the satisfaction of the department that—(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) . . . (c) that such individual is customarily engaged in an independently established trade, occupation, profession or business": 43 PS Supp. (i), As amended, April 23, 1942, Ex. Sess., P. L. 60, sec. 1; May 21, 1943, P. L. 271, No. 125, sec. 1; May 27, 1943, P. L. 717, sec. 1; May 29, 1945, P. L. 1145, sec. 1. Effective January 1, 1945.

Subsections (u) and (x) of section 753, as amended, May 29, 1945, state: "(u) 'Unemployment'—An individual shall be deemed unemployed with respect to any week during which he performs no services and with respect to which no remuneration is paid or payable to him . . ." Effective June 1, 1945.

"(x) 'Wages' means all remuneration for employment . . . paid with respect to all services performed prior to January first, one thousand nine hundred and forty-two . . ." Effective June 1, 1945.

It is provided in the Act, 43 P.S. 802, as amended, 1942, on April 23, P. L. 60, sec. 4; 1943, May 21, P. L. 337, sec. 1; 1945, May 29, P. L. 1145, sec. 9, as follows: "An employe shall be ineligible for compensation for any week—(a) . . .; (b) In which his unemployment is due to voluntarily leaving work without good cause: . . ."

In discussing the phrase "good cause" the Superior Court says, ". . . it must be a good cause which animates a man to seek the fullest expression and amplest development of his highest skills and capacities, and to strive for steady employment, be it in his own business or in service for others." It may be conceded that this state-

---

occupation, profession or business." 43 PS 753 (j), Dec. 5, 1936, Second Ex. Sess., P. L. (1937) 2897, art. I, sec. 4; May 18, 1937, P. L. 658, sec. 1; June 20, 1939, P. L. 482, sec. 1; May 16, 1940, Extra Sess., P. L. 946, No. 9, sec. 1.

ment is an expression of sound social philosophy, but the "good cause" thus referred to is not the "good cause" which under the Act justifies an employe voluntarily leaving his work. If an employe left his work to fight for his country on the field of battle his act would be praiseworthy but his patriotic motive and his willingness to sacrifice his life would not constitute the good cause which as a motive for leaving his work would maintain his eligibility for compensation benefits afterwards. By "good cause" as used in the Act is obviously meant such a cause as justifies an employe's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed. For example, if an employe was compelled to work in a position where his life was constantly menaced by a heavy object over his head which was suspended from the ceiling by a palpably inadequate or defective chain, he could successfully plead "good cause" for voluntarily leaving his employment. The same would be true if he was compelled to work under inexcusable conditions which were palpably detrimental to his health, such as working in a mine or a factory where the supply of fresh air was obviously insufficient to sustain life.

In *Dames Unemployment Compensation Case*, 158 Pa. Superior Ct. 564, the Superior Court held that a woman who left her employment to marry could not have that praiseworthy motive accepted as a good cause for leaving her employment. In that case Judge Reno said, "no legal obligation rested upon the claimant to marry or to join her fiance" (who was in the Armed Forces). This case is an example of the fact that a laudable motive for leaving employment and a "good cause" within the meaning of the Act are entirely different things.

In *Teicher Unemployment Compensation Case*, 154 Pa. Superior Ct. 250, the claimant left her employment to live with her husband who was in the Armed Forces. All seven judges of the Superior Court held that that claimant by voluntarily leaving her work and moving

to Alexandria to be with her husband made herself "unavailable for work" and was therefore not entitled to compensation. Five members of the Court declared that the claimant in leaving her job in order to be with her husband left her work "with good cause". This latter conclusion was not necessary to a decision of the case. We express no agreement with the dictum that such a "humanly justifiable cause" as "the impulse which induces a devoted wife to spend with a husband, who is a member of the Armed Forces in time of war, what may prove to be the last days they shall ever be together on earth" (as the Superior Court expressed it) constitutes a "good cause" for leaving a job, within the meaning of the Act.

In *Sturdevant Unemployment Compensation Case,* 158 Pa. Superior Ct. 548, it appeared that a married woman, employed as a skilled machine operator in an industrial plant, left her work to join her husband in the armed forces near a city other than that in which she was employed; that she registered for work in the nearby city, stating that she was available for a 30-day period only; and that in the new locality there were no demands for her particular skill; it was held, apparently on the authority of the dictum in the *Teicher* case, supra, that claimant was entitled to unemployment compensation benefits. In this *Sturdevant* case Judge RENO said:

"Of course, 'good cause' and 'personal reasons' are flexible phrases, capable of contraction and expansion, and by construction, all meaning can be compressed out of them or they may be expanded to cover almost any meaning. . . . However, in whatever context they appear, they connote, as minimum requirements, real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith. . . . When we approach the problem of a married woman who leaves her work to join her husband we

realize immediately that we are in the presence of a compulsion which readily supplies a personal reason and a good cause. Under our law, it is the legal right of the husband to select the marital domicile and it is the legal duty of the wife to reside with him. Hence, when a husband moves the marital domicile to a distant point where he secures work and his wife voluntarily leaves her work to accompany him, her compliance with the duty which the law casts upon her satisfies the requirements of 'good cause'."

To hold that a married woman who quits her job to join her husband in a new domicile is voluntarily becoming "unemployed" for a "good cause" within the meaning of the Act is to open the door to so much fraud on employers that one may doubt that such a construction of the Unemployment Compensation Act conforms to the canon that "all laws should receive a sensible construction": per FIELD, J., in *United States v. Kirby,* 7 Wall 482, 486, cited with approval in *Watson v. Witkin,* 343 Pa. 1, 6. In this last cited case we quoted with approval what Judge CARDOZO said in *In re the Matter of Jacob Rouss, an Attorney,* 221 N. Y. 81, 116 N. E. 782, as follows: "Statutes must be so construed, if possible, that absurdity and mischief may be avoided." If a woman can quit her job in order to follow her husband into another domicile where work for her will not be available, and then become entitled to the benefits of this Compensation Act, and if a workman can quit his job to go into private business and then when that business fails he can still reap the benefits of this Compensation Act, the latter will in many instances be used as a "short cut" to a temporary pension. While the good faith of the claimants in such cases is always open to attack, whoever makes such an attack has the burden of proving bad faith and in this class of cases it will be a difficult burden to maintain.

No principle applicable to the interpretation of statutes has been more widely used than the principle enu-

merated in *Heydon's Case,* 3 Coke 7a, 14 Eng. Rul. Cas. 816, cited in 25 R. C. L. 1016, section 254, as follows: ". . . for the sure and true interpretation of all statutes in general four things are to be discerned and considered: '(1) What was the common law before the making of the act? (2) What was the mischief and defect for which the common law did not provide? (3) What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth. And (4) the true reason of the remedy.' "

These second and fourth "things" should be considered in solving the question before us. The "mischief" to be remedied was the condition of involuntarily out of work laboring men in an era when wages were such that it was difficult for them to save money for the proverbial "rainy day". Such unemployed workmen frequently became indigent and their families were left without the necessities of life. The "true reason of the remedy" provided in the Unemployment Compensation Act is clearly set forth in the intendments of the Act, inter alia, in section 3 (43 PS 752), as follows:

"a. That the economic insecurity which the act seeks to avoid is the 'Involuntary unemployment and its resulting burden of indigency' which falls with crushing force upon the unemployed worker . . ."

"b. That this insecurity can best be met 'by the systematic setting aside of financial reserves to be used as compensation for the loss of wages by employes . . .'

"c. That the Commonwealth is justified in exercising its police powers 'for the compulsory setting aside of unemployment reserves . . .' This reserve is of course to be set aside by the employer and is 'to be used for the benefit of persons unemployed through no fault of their own'."

These intendments make it clear that those within the protection of the Act are "unemployed workers". By that last quoted phrase is meant *those who while work-*

*ing for wages become unemployed.* In that class there is *not* included those who did work for wages but who voluntarily removed themselves from the latter class to become independently engaged in a business of their own.

When this claimant voluntarily quit his job as an employe for wages to become an independent contractor he took himself out of the class entitled to the protection of the Act now under consideration. He became a businessman at his own risk. He could not assume his new status with the legal assurance that if his expectations of more favorable economic results from his new status was realized he would be the *sole gainer while if his venture failed he could fall back on the compensation benefits* which were his when he was a worker for wages. The law does not make Pennsylvania employers the insurers to any extent whatsoever of the private ventures of their employes. In a free society any employe may quit his work for any reason which appears to him adequate, but if he "gambles" with his job as an employe in the hope of becoming a businessman and an employer himself he cannot expect to find that the "game" is one in which all the possible gains are to be his while the losses, if any, are to be borne chiefly by his last employer.

In his testimony claimant gives his reason for ceasing to be an employe and going into business for himself. He said: ". . . from the time I put in there and the way I put the time in I figured I wasn't getting the proper break I should have gotten." He added what is quoted in the third paragraph of the opinion. Without consulting his employer and without seeking any information as to his probable employment tenure he decided that he would leave the ranks of wage earners and become a business man, and so on August 4, 1945 he became "customarily engaged in an independent business", that of roofing. He continued "on his own" from August until November, when he discovered that by his change of

status he had worsened his economic position. If, for example, he had been admitted to the Bar just before the war and had at once, for either patriotic or economic reasons, become an employe of the Sun Shipbuilding Company and had on August 4, 1945 quit his job and entered upon the practice of law and then about three months later had decided that the law was not his field, he could not by abandoning his professional career have restored his eligibility to the Unemployment Compensation benefits he had voluntarily forfeited months before by renouncing his then status.

It is true that claimant was unemployed after he failed as a businessman, but since he had renounced his status as a "wage earner" in order to become a "businessman" his failure in the latter role did not automatically restore him to the status of an "unemployed employe" any more than a manumitted slave's failure to gain a livelihood on his own piece of land would automatically restore him to the status he had before his manumission. Claimant can be restored to his former status of an employe only by *again* performing as an employe "services for an employer in any employment subject to this Act". The "good cause" which compelled claimant to terminate his career as an individual contractor cannot be used as a substitute for the not-good cause which impelled him to leave the employ of the Shipbuilding Company.

An individual wage-earner is within the protection of the Unemployment Compensation Act only as long as he has the status of an *employe as that term is used in the Act*. His idleness *immediately following his employment* does not affect his status. He is still an employe, though out of work, if (1) his being out of work was not willed by himself, or (2) if his being out of work was voluntary but was based on a "good cause" within the meaning of the Act. The "good cause" which justifies an employe's terminating his relations with his employer must, other than in those exceptional cases where

reasons "personal to the employe" may under a certain state of facts be adjudged "good", be one connected with his employment. He certainly is not within the "good cause" provision if he quits his employment in order to comply with the wishes of his wife, or in order to marry a girl who made his quitting his employment a condition precedent to the marriage, or because of some whimsical desire or fancy or ambition of his own. See *Barclay White Co. v. Unemp. Comp. Bd.*, 356 Pa. 43, 48, 50 A. 2d 336, where we emphasized the fact that Article I, section 3, of the Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, as amended, was enacted "for the benefit of persons unemployed through no fault of their own." In that case we also said (p. 48): "It is impossible to give a general definition of 'good cause'. The meaning of those words must be determined in each case from the facts of that case." We added: " 'good cause' must be so interpreted that the fundamental purpose of the legislation shall not be destroyed." Even in matters connected with his employment there must be some limit to the legally approved list of "good causes" for quitting employment. The quitting must be for such a cause as would reasonably motivate in a similar situation the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the "compensated unemployed".

An employe may contend that the character and habits of his fellow employes are distasteful to him, he may contend that the work he is engaged in (such as the making of war munitions or alcoholic beverages) offends his religious or moral principles, or he may contend that his family objects to his working in a job in which he becomes begrimed with dirt, yet these and similar reasons cannot be legally accepted as a "good cause" for leaving one's employment. If an employe leaves his position as a wage earner so that he may be-

come a professional man or a business man or any other sort of "free-lance" he cannot successfully contend that he left his former employment for a statutorily "good cause" and that if he fails at his independent work he is immediately restored to his status quo ante.

We do not agree that since this claimant's ambition to be independently self-supporting was a "laudable" one, such ambition must be adjudged a "good cause" for leaving his then employment. In most civil cases requiring the adjudication of rights and liabilities the laudability of an actor's motive has no bearing on the legal appraisal of his act. If every reason which appeals to an employe's head or his heart is to be accepted as a "good cause" for his or her voluntarily leaving a job in a locality where there is no other work available, the Unemployment Compensation Law will become in many instances an invitation to a compensated rest.

This claimant on August 4, 1945, voluntarily took himself out of that class which is under the protection of this law for a cause which cannot legally be recognized as "good". He took an economic risk when he left the employer-employe field with the expectation of succeeding as an independent contractor and then becoming an employer. When his private venture failed he did not ipso facto become an unemployed *employe*— he became an unemployed *businessman.*

The judgment of the Superior Court is reversed and the order of the Unemployment Compensation Board of Review affirming the decision and order of the bureau and the referee granting the claimant unemployment compensation benefits, is set aside.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I think the opinion for the Superior Court fully and correctly justifies the decision made in this case by the Unemployment Compensation Board of Review which I would affirm on the able opinion of Judge RENO.