Savage Unemployment Compensation Case.

Pittsburgh Pipe and Coupling Company,
Appellant, *v.* Unemployment Compensation
Board of Review.

Argued September 27, 1960. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*J. C. Hill,* with him *Donald M. Birch* and *William J. Kenney,* for appellant.

*Marshall J. Seidman,* Deputy Attorney General, with him *Anne X. Alpern,* Attorney General, for Unemployment Compensation Board of Review, appellee.

Opinion by Mr. Justice Musmanno, November 15, 1960:

From 1951 to December, 1957, Charles P. Savage was employed as a machine operator at the plant of the Pittsburgh Pipe and Coupling Company in Allison Park (near Pittsburgh). His home was in Hastings 60 miles distant from the plant. In order to avoid

the burden of a 120-mile round trip between these two points every day, he stayed at the home of his sister in Gibsonia (near Allison Park), paying her $25 a week for room and board. Every weekend he returned to his wife and four children (the oldest being 10 years of age) in Hastings.

On December 19, 1957, Savage now receiving wages amounting approximately to $22 a day, the plant shut down for a two-week period and Savage was directed to return on January 6, 1958, but at laborer's wages at $2 per hour for a four-day week, activity at the plant having slackened. This reduction in pay and work-week (which was in accordance with a labor-management agreement) effected a lowering of Savage's income to about $64 a week.

On January 2, 1958, Savage notified his employer that his wife had suffered a disabling spinal injury and for that reason he was compelled to remain at home to take care of her and the children. His employer recommended that he take a three-month leave of absence. Savage refused to accept this offer and made claim for unemployment compensation. The Bureau of Employment Security found that he was entitled to unemployment compensation benefits. The company appealed to the unemployment compensation referee who reversed the board on the basis that the claimant had not terminated his employment for reasons of a necessitous and compelling nature as specified in Section 402(b) of the Pennsylvania Unemployment Compensation Law.* The claimant appealed to the Unemployment Compensation Board of Review which reversed the referee, reinstating compensation. The company appealed to the Superior Court which

---

* Act of December 5, 1936, P. L. (1937) 2897, Art. IV, §402, as amended.

affirmed the award by an equally divided Court. We granted allocatur.

The appellant company does not contest the facts as set out by the Board of Review and as briefly adverted to here. The only question for determination by this Court is whether the facts establish that the claimant was, as a matter of law, ineligible to receive compensation benefits on the basis that he terminated his employment without cause of "a necessitous and compelling nature."

To answer this question it is necessary to pass in review, briefly, the legislative history of the Pennsylvania Unemployment Compensation Act. The first enactment of this law in 1936 was silent on the topic of necessitous abandonment of one's job. It contained no exception to the provision that: "An employe shall be ineligible for compensation for any week in which his unemployment is due to . . . (b) voluntarily leaving work . . ." (Act of December 5, 1936, P. L. (1937) 2897, §402.)

In time it became apparent that this wording deprived meritorious employees from unemployment compensation where, although ostensibly voluntarily leaving employment they were in reality compelled to do so by circumstances beyond their determination. Thus, in 1942 the Legislature amended the act to read: "An employe shall be ineligible for compensation for any week . . . (b) in which his unemployment is due to voluntarily leaving work without good cause . . ." (Act of April 23, 1942, P. L. 60, §402.)

What constituted "good cause" became a matter of judicial interpretation. In 1944, the Superior Court in the *Teicher Unemployment Compensation Case,* 154 Pa. Superior Ct. 250, held that the action of the claimant there involved, in voluntarily quitting her employment and moving to another city to live with her hus-

band who was a member of the Armed Forces in time of war was "good cause."

In the *Sturdevant Unemployment Compensation Case,* 158 Pa. Superior Ct. 548,. 557 (1946), Judge RENO, in a masterful opinion, said: "If a worker leaves his employment when he is compelled to do so by necessitous circumstances or because of legal or family obligations, his leaving is voluntary with good cause, and under the act he is entitled to benefits. The pressure of necessity, of legal duty, or family obligations, or other overpowering circumstances and his capitulation to them transform what is ostensibly voluntary unemployment into involuntary unemployment."

In the *Mooney Unemployment Compensation Case,* 162 Pa. Superior Ct. 183 (1948), the claimant, a married woman with small children,. had been employed at a job which started in the evening; her shift was then eliminated and she was offered work which began at 11:30 a.m. She refused to accept the change, stating she desired to continue on the night shift or be assigned to work starting at 9 a.m., because she could not otherwise take care of her children. When the employer would not or could not offer her the hours of work she requested, she quit her employment and made claim for unemployment compensation. The Superior Court affirmed unemployment compensation because she had "good cause" for leaving her employment, pointing out: "She [the claimant] was legally obligated to care for her three small children. Family obligations cannot be considered as mere whim or fancy but, on the contrary, are real and compelling reasons. The board's finding that she desired work at a time to permit her to fulfill her family obligations is supported by the evidence and conclusive . . . Moreover, the convenience to which claimant was referring was not a whim or caprice, but was a real circumstance, a

substantial reason and an objective condition existing at her home."

*Hamilton Unemployment Compensation Case,* 172 Pa. Superior Ct. 413, and *Quiggle Unemployment Compensation Case,* 172 Pa. Superior Ct. 430, were also cases where the claimants were awarded unemployment compensation because they could not carry on at work due to caring for small children at home.

In 1953 the Legislature amended the Act to exclude marital, filial and domestic circumstances as "good cause" within the meaning of the Act. "An employe shall be ineligible for compensation for any week . . . (b) in which his unemployment is due to voluntarily leaving work without good cause . . . marital, filial and domestic circumstances and obligations shall not be deemed good cause within the meaning of the act." (Act of August 24, 1953, P. L. 1397, §402.)

Two years later, however, the Legislature reconsidered the subject and, by an amendment enacted on March 30, 1955 (P. L. 6, §5), declared that: "An employe shall be ineligible for unemployment compensation for any week . . . (b) in which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature."

By this amendment the Legislature removed the specific exception it had placed in the Act of 1953 and thereby indicated its intent to adopt the judicial construction of the language of the 1942 amendment which had caused it to enact the 1953 exception. The change in the term "good cause", appearing in the 1942 Act, to "cause of a necessitous and compelling nature" in the 1955 Act does not call for a different conclusion from that set forth in the *Sturdevant* case, where Judge RENO said: "When a section of an act is amended, the amendment and the original unamended portion of the section are to be read together and viewed as one law

passed at one time. Statutory Construction Act of May 28, 1937 . . . So, the 1942 amendment to §402 (b), supra, and the 1945 amendment, although they became effective at different dates, must be read as though the whole section as amended had been enacted in 1945. And the repetition of the language of the 1942 amendment in the 1945 amendment, without alteration or amendment, indicates the intent of the 1945 legislature to adopt the judicial construction of the language of the 1942 amendment."

In the meantime the *Teicher* case, supra, had been filed on January 27, 1944. Judge RENO, in discussing this phase of the entire picture, recalled that one of the reasons for the call of the Special Session which enacted the Act of 1945 was designated as "Liberalization of the Unemployment Compensation Law," and then said: "These circumstances justify the conclusion that the General Assembly deliberately chose to enact into law purely personal reasons as good cause, and a majority of this court announced that conclusion in Teicher Unemployment Compensation Case, 154 Pa. Superior Ct. 250, 35 A. 2d 739."

The same reason applies to the instant situation. When the Legislature in 1955 removed the specific exception of the 1953 amendment precluding marital, filial and domestic circumstances and obligations from being good cause within the meaning of the Act, the Legislature intended those obligations again to be good cause, as had been held prior to the 1953 exception. The change of the term "good cause" as it appeared in the 1942 Act to "cause of a necessitous and compelling nature" in the 1955 amendment is simply a matter of phraseology which in no way adversely affects the conclusions reached by the Superior Court in the *Teicher, Sturdevant, Mooney, Hamilton* and *Quiggle* cases, supra.

Judge RENO made an irrefutable observation of legal, sociological and economic significance when he said: "The Unemployment Compensation Law is remedial humanitarian legislation of vast import. Its benefits sections must be liberally and broadly construed. It is primarily intended for the benefit of unemployed workers."

When an employed person becomes unemployed, he is, by that fact in itself, potentially a beneficiary of the Act. The law was passed to protect society itself as much as the individual involved because the cumulative distress of vast numbers of unemployed can wreck the stoutest and most solid economy. Thus, the Legislature in its wisdom, provided a formidable bridge over which the recently dismissed employee may pass unharmed (or as slightly harmed as possible) from one job to another.

The Act has wiped out the acute and almost unbearable hardships which heretofore accompanied unanticipated loss of employment. The employee does not need to fear now that suddenly, because he has been "laid off", the bread will be taken off his table and his wife and children will be bereft of adequate heat, light, raiment and perhaps even a roof over their heads. The Unemployment Compensation Act is proof that mankind is on the march toward an ever-increasing concern over one's fellow-man who, through no fault of his own, falls into the waters of want and privation because of economic floods which he can no more control than the rains and the snows.

Thus, the Act is a lifesaver to the employee struggling in the adversity of jobless insecurity, but what of the person who has a job but may not work at it because of inexorable circumstance as unappealable and as unremediable as the rain, the snow, and the storm? Is he to be denied the benefits of the Unem-

ployment law? The Legislature has answered that question in the negative. Whether the unemployment is due to the closing of the plant or the wrecking of the bridge which leads to the plant, the employee still needs to eat. The General Assembly accordingly has provided that the employee in such a situation may obtain the benefits of the Act, provided the facts demonstrate that he is kept away from his job for reasons of a "necessitous and compelling nature." In determining whether such facts exist, the test is not whether the claimant has taken himself out of the scope of the Act, but whether the Act specifically excludes him from its provisions. That is what is meant by a liberal and broad construction.

Of course, the Act is not intended to require payment to the shirker, the slothful or the indolent, but if the claimant is obviously in good faith in his expressed desire to work, but no matter how earnestly he reaches, his arms are not long enough to take and hold on to his job, he is in the "necessitous" state spelled out in the Act. The employee in the case at bar is desirous of work, he needs it, he wants it, but he lives 60 miles away from the job and his wife is ill, and there are four children of tender age who require his attention and care.* It would be difficult to conjure up a reason of a more necessitous and compelling nature to leave the job which he cannot reach and at the same time discharge the obligations which he owes

---

* The employer does not in this appeal raise the question of Savage's good faith in advancing his wife's illness as the cause of terminating his employment, the sole issue presented to us at this time being whether, as a matter of law, conceding the truth of his averment that his wife's illness necessitated his staying at their home in Hastings, such reason was a cause of "necessitous and compelling nature" within the intendment of the Unemployment Compensation Act.

to his family through law, love, and the loyalty which in America one expects of a husband and father.

The appellant company says in its brief: "The cornerstone of Mr. Savage's claim for unemployment benefits is the distance from his work to the place of his wife's abode and the resultant inconveniences, expenses, and problems."

The appellant here has taken abstract argumentation and sought to make it the foundation of the claimant's case, but it does not accord with the realities. Hastings, which is 60 miles away, from the plant of the Pittsburgh Pipe and Coupling Company, is not the abode of the claimant's wife, but his own abode. He transiently stayed at his sister's place in Gibsonia as a boarder four or five days a week in order to avoid the financial expense and tremendous expenditure of time in traveling to and from Hastings every day.

The appellant argues further: "This Court has in many instances recognized the wife's moral and legal obligation to arrange her work schedule to meet her family requirements. Quiggle Unemployment Compensation Case, 172 Pa. Superior Ct. 420 (1953). But it has never held that a husband has such a legal obligation to move to the wife's abode. Indeed, the contrary is true, that the wife's legal duty is to follow her husband's selection of residence. Greer v. Greer, 178 Pa. Superior Ct. 643 (1955)."

But here again it must be asserted that Hastings is not the abode of Mr. Savage's wife. It is the residence and permanent domicile of the Savage family. This is not the case of an employee voluntarily and without reason choosing a new domicile too distant from his place of employment and using that distance as a reason for abandoning his job. It is to be repeated that in this case, the claimant is returning to what has always been his domicile and returning there

because his wife's illness and the care of his minor children demand his presence.

Since the referee and the board of review have found as a fact that the claimant's reason for terminating his employment was that his wife's spinal injury required his assistance and services at their family home, and since we hold that under the law this constitutes a cause of a "necessitous and compelling nature," we, therefore, conclude that the claimant was not rendered ineligible for the claimed benefits.

The decision of the Unemployment Compensation Board of Review, affirmed by an equally divided Superior Court, is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

The majority opinion, in my judgment, violates both the letter and the spirit of the Unemployment Compensation Act. The Act was never intended to be a "Relief Act" for persons who are needy or destitute and on relief, or who find it more pleasant and sometimes more profitable* (as in the instant case) to become or remain unemployed. Applicant testified he would get less wages for working than he would have gotten from unemployment compensation. The Act was intended to provide compensation for working men and women who have been thrown out of work through no plan or desire or device** or fault of their own and really want to work** but cannot get employment because there isn't any, or because of circumstances of

---

* Because of tax exemption and/or reduced earnings.

** "[Q.] Had you been recalled to your former position, would you have gone back? [A.] I don't know. I don't think I could have gone back then. . . . On account of my wife. . . . [Q.] Is she now going to a doctor? [A.] No, not now. But her back is bad."

a real, necessitous and compelling nature* beyond their control.

---

*"[Q.] Had you been recalled to your former position, would you have gone back? [A.] I don't know. I don't think I could have gone back then. . . . On account of my wife. . . . [Q.] Is she now going to a doctor? [A.] No, not now. But her back is bad."