29 So.2d 687

**BROADWAY, Director of Department of Industrial Relations, v. BOLAR.**

1 Div. 536.

Court of Appeals of Alabama.
March 25, 1947.

J. Eugene Foster and Aubrey M. Cates, Jr., both of Montgomery, for appellant.

Wm. Grayson, of Mobile, for appellee.

HARWOOD, Judge.

This case, involving a claim for payments of unemployment compensation allegedly due under the Unemployment Compensation Law of this state, was tried in the Circuit Court of Mobile without a jury. The court rendered a judgment in favor of the plaintiff, and awarded her $250. In the trial below it was stipulated that if the plaintiff was entitled to any award it should be for nineteen weeks at $12 per week. Apparently there was a miscalculation in determining the amount of the judgment entered by the court below.

In his brief counsel for appellant (defendant below) states that it was agreed in the court below that the technical prerequisites required to be met under the State Unemployment Law, which have to be met before an unemployed person is entitled to compensation, were met. The case was obviously tried on such theory, and we therefore proceed on such assumption. These prerequisite technical requirements may be found in Sections 191, 193, 194, 207, 208, 209, 213, 214, Title 26, Code of Alabama 1940, and amendments.

The issue was thus narrowed to the sole issue of whether or not the appellee (plaintiff below) did fail, without good cause, to apply for available suitable work when same was offered her through the United States Employment Service.

The portions of the State Unemployment Law pertinent to the issues of this case, found in Par. E, of Section 214, Title 26, Code of Alabama 1940, as amended in 1943, are as follows:

"An individual shall be disqualified for benefits for total or partial unemployment:
* * *

"E. If he fails, without good cause, either to apply for or to accept available suitable work or to return to his customary self-employment when so directed by the director, or when he is notified of suitable work or it is offered him through a state employment office or the United States employment service, or directly or by written notice or offer to any such employment office or employment service by an employer by whom the individual was formerly employed. Such disqualification shall continue until the individual has accepted employment and has earned wages in such employment amounting to twenty times the individual's weekly benefit amount (or the equivalent thereof, as determined by the director if the individual has returned to his customary self-employment).

"(1) In determining whether or not any work is suitable for an individual, the director shall consider the degree of risk involved to his health, safety, and morals, his physical fitness, and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence; provided that no work or employment shall be deemed unsuitable because of its distance from the individual's residence, if such work or employment is in the same or substantially the same locality as was his last previous regular place of employment and if the employee left such employment voluntarily without good cause connected with such employment.

"(2) Notwithstanding any other provisions of this chapter, no work shall be deemed suitable and benefits shall not be denied under this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions: * * *

"(b) If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality."

The appellee is twenty-nine years of age, and weighs around 230 pounds. In 1944 she worked for the Ruberoid Company in Mobile, stacking shingles. Her starting wages were 57 cents per hour, and worked up to 64 and 68 cents per hour on rotating

shifts. However her work as a shingle stacker was unsatisfactory and she was discharged on 1 May 1945. Her work experience prior to the job with the Ruberoid Company has been as cook for the white boys detention home for about three years, and assistant superintendent of the colored boys detention home in Mobile, receiving $40 per month and board in both jobs. Other than the work experienced in the three above mentioned jobs the appellee has had no training.

On 25 November 1945 the appellee was interviewed by Mrs. Wilson in the United States Employment Office at Mobile relative to a job opening. Concerning this visit to the Employment Office the appellee testified that she talked to Mrs. Wilson and also to another lady and that this other lady referred her to a job with the Loop Fish and Oyster Company in Mobile for a job as a fish packer, which job paid 40 cents per hour. Appellee alleges she told them at the Employment Office that her sister had worked at the Loop Fish and Oyster House about two years ago, and that her sister had told her that fish packers had to wade in water and pack fish in ice, and she told them she could not stand that. Appellee was then told that the fish company furnished rubber boots for employees to wear at work. As to her reasons for not taking the offered job, which apparently were not disclosed to the Employment Office interviewers, we quote from the testimony of appellee on her direct examination:

"Q. Go ahead? A. And they said they furnish boots and you can wear them, but I can't stand rubber; I haven't got a doctor's certificate; I can't wear rubber boots; I do much better when I don't.

"Q. Why can't you wear rubber boots? A. It draws my knee or something; I have something like rheumatism.

"Q. You have suffered from rheumatism? A. Yes sir.

"Q. And this ice and water and cold affects your rheumatism? A. I don't know about that.

"Q. When it gets damp or rains does it hurt your rheumatism? A. No, but rubber does.

"Q. Did they offer you any other job? A. No other job."

Other than talking to her sister, the appellee had no knowledge of work in a fish and oyster plant. She had never been in one, and did not go to the Loop Fish and Oyster Company to investigate the job offered her.

Appellee has never consulted a doctor as to why wearing rubber affects her, nor has she consulted a doctor since prior to her job with the Ruberoid Company.

Since separation from her job at the Ruberoid Company appellee has done no work other than an occasional day's work in a private home for which she sometimes received as much as two dollars a day, depending on the number of hours worked.

Mrs. Wilson's testimony as to the substance of the interview is in many aspects contradictory of the version given by the appellee. Mrs. Wilson testified that she was a senior interviewer with the United States Employment Office at the time she interviewed the appellee, and her duties were to contact employers and develop job orders, then refer applicants to such jobs. She had visited the Loop Fish and Oyster House and learned from personal knowledge the duties connected with a job as a fish splitter. In this work the employees stand on a wooden grating, and split and de-bone fish placed on tables by other employees. While slosh boots were furnished, a majority of the employees elected not to wear them, and Mrs. Wilson could see no reason why boots would be worn in working as a fish splitter. Mrs. Wilson further testified that she explained the nature of the job to the appellee, who declined to accept it for the reason that her sister had worked for the Loop Fish and Oyster Company and "couldn't get along with her boss and she (appellee) didn't want to go out there." Mrs. Wilson stated that in refusing to accept the offered job the appellee did not say anything about not being able to work around ice.

Mrs. Wilson further testified that the job offered appellee was that of fish splitter, not a fish packer as testified by appellee; that no one in the Employment Office offered appellee a job as a fish packer as no such job was listed with the Employment

Office at that time, but only a job as fish splitter was available.

In the field of jurisprudence relating to the interpretation of the various State Unemployment Compensation Laws there are few developed doctrines. The Superior Court of Pennsylvania, in Bliley Electric Co. v. Unemployment Compensation Board of Review, 158 Pa.Super. 548, 45 A.2d 898, 901, having before it a question involving the Pennsylvania Unemployment Compensation Law, wrote as follows:

"The statute, almost ten years old, introduced into our law a new concept of social obligation, extended the police power of the State into a virgin field, and created a body of rights and duties unknown to the common law. England was the first common law country to operate a similar system, and its experience began as an experiment in 1911. Its law, revised as trial exposed error, became the basis for the American unemployment compensation system, although in detail there are vast variations between the American and British systems. Wisconsin passed an act in 1932, but it required the enactment of the Social Security Act by Congress on August 14, 1935, 49 Stat. 635, 42 U.S.C.A. § 803, to induce other states to adopt a system. All the states have enacted conforming legislation, and their statutes include the basic requirements laid down by the Act of Congress, but they differ widely and sharply in respect to the details which Congress left open to state legislation.

"The administration of the laws is committed to agencies designated or organized by each state, over which the federal Social Security Board exercises advisory and supervisory functions. The agencies, state and federal, have produced an immense and impressive body of decisional law, but so far comparatively few of the many vital questions arising out of the legislation have been presented to judicial scrutiny. Until more cases involving a wide variety of factual situations have been brought to the courts, judicial answers will necessarily lack the usual rigor of legal formulas, and tend to be tentative and groping in their nature. Concrete cases will develop general principles, and precise definition will issue from the wisdom acquired from greater experience."

The two questions ultimately developed by this record are (1) whether the job offered appellee was available suitable work, and (2) did appellee have reasonable cause to refuse the job offered?

Reference to Par. E, of Section 214, Title 26, Code of Alabama 1940, as amended, discloses that the factors pertinent to this case to be considered by the Director of the Department of Industrial Relations in determining whether the available job was suitable for this appellee were (1) degree of risk to health involved, (2) safety, (3) morals, (4) physical fitness of applicant, (5) prior training of applicant, (6) applicant's experience and prior earnings, (7) length of applicant's unemployment and prospects for securing local work in customary occupation, (8) distance of available work from applicant's residence. It is also noted that paragraph (2) (b) of Section E, supra, provides:

"If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality," then the work shall not be deemed suitable.

Under the evidence there is no reason to consider factors (2) and (3), since there is nothing to indicate that the offered job was unsafe, or in any way detrimental to morals.

Factor (1), pertaining to the degree of risk to health involved, and factor (4), pertaining to the physical fitness of the applicant to undertake the work offered, are so interwoven as to be determined largely by the same considerations.

The appellee is a woman weighing 230 pounds and twenty-nine years of age. According to her testimony she has suffered from something like rheumatism, and she does "much better" when she does not wear rubber boots. She has not consulted a doctor since prior to her job with the Ruberoid Company. She was not sure that ice, cold, or water affected her condition, but knew that rain or dampness did not affect it. Only wearing rubber boots had a deleterious effect on her condition. There is no evidence that appellee had ever worn rubber boots, and the nature of her former jobs would not indicate that she wore them at that work. We think it highly signifi-

cant that appellee herself testified that she did not tell the Employment Office interviewers that she would not take the job because she feared the effects of wearing rubber boots.

In so far as the factors of risk to her health, and her physical fitness to do the work offered her, appellee has, in our opinion, failed to meet the burden cast upon her of establishing these factors.

Judgments cannot be predicated on conjecture. Goodwyn v. Union Springs Guano Co., 228 Ala. 173, 153 So. 246; Southern Ry. Co. v. Dickson, 211 Ala. 481, 100 So. 665.

Appellee did not even go to the Loop Fish and Oyster House to investigate the conditions under which she could work. "The Unemployment Compensation Law does not contemplate that a job must seek out a man and coax him to work, but presupposes some effort on his part to secure work." Canton Malleable Iron Co. v. Green, 75 Ohio App. 526, 62 N.E.2d 756, 757.

To conclude that she had met her burden by the evidence introduced in her attempt to prove these factors would, we feel, require a nonpermissible resort to speculation and conjecture.

We find nothing in the record indicating that appellee's prior training (Factor 5), or experience and prior earnings (Factor 6), could in any way justify appellee's refusal to take the work offered her. Her prior work experience as cook and assistant superintendent of the colored boys detention home at wages of $40 per month, and her job as a shingle stacker for the Ruberoid Company at wages of 57 to 68 cents per hour, from which job she was discharged because of the unsatisfactory character of her work, cannot be considered as having fitted appellee for other than unskilled work.

While it is true that appellee did for a period of some eighteen months work as a shingle stacker at wages of 54 to 68 cents per hour, it is noted that this was during a time of the war emergency, when from common knowledge we know there was a critical labor shortage and the consequent higher rates of pay for all labor. Even so, appellee lost this job because of the unsatisfactory character of her work. Certainly the wages offered for the job at the Loop Fish and Oyster Company compared favorably with appellee's wages for some three years while employed at the detention home.

As to factor (7), length of applicant's unemployment and prospects of securing local work in customary employment, it appears from the evidence that appellee was discharged from her job with the Ruberoid Company on 1 May 1945. From that time and until she was offered the job at the fish company some seven months later the appellee had no job, though she did work on very occasional days as a domestic servant for which she sometimes was paid as much as two dollars per day.

From her past we cannot see that appellee can be catalogued as having any customary employment, other than as an unskilled laborer. A skilled laborer is justified in refusing as unsuitable work offered immediately after separation from his last job, when the offered work is of a type that would require less skill and training than he possesses, and less remuneration. Such justification for refusal however, even for a skilled worker, diminishes as the period of unemployment lengthens. The unemployment compensation laws were not passed as an invitation to idleness. As stated by the Supreme Court of New Hampshire in Hallahan v. Riley, 94 N.H. 48, 45 A.2d 886, 888:

" 'The law does not presume that a person should be required to accept work at less than her highest skill or accept work at other than her usual skill and remuneration provided such work is either available or that prospects are good for obtaining such work within a reasonable time. However, in the absence of such work or good prospects of obtaining the same within a reasonable time, if the claimant desires to be eligible within the Indiana Employment Security Act she must stand ready to accept other work for which she may be qualified by training and experience and to accept the rate of pay that prevails in that vicinity for that type of work.' In other words, while a woman may be justified in refusing as unsuitable, work offered to her immediately after her separation from her

job, the situation may change after the lapse of a considerable time during which she has remained unemployed. Work which was unsuitable at the beginning of her unemployment may become suitable when consideration is given to the length of unemployment and the prospects of securing her accustomed work. Although the applicant may continue to refuse jobs paying a lower rate of compensation, she must do so at her own expense rather than at the expense of the unemployment fund. The cushion of security between jobs provided by the statute was not designed to finance an apparently hopeless quest for the claimant's old job or a job paying equal wages."

Factor (8), pertaining to distance of available work from applicant's residence, is not of importance in this case as the offered job and applicant's residence were both in Mobile.

There is no evidence in this record tending to show that the wages, hours, or other conditions connected with the job offered appellee at the fish company were substantially less favorable than those prevailing for similar work in Mobile. There is therefore no reason to consider the application or effect of Par. (2) (b), of Section 214, supra, upon the developed facts of this case.

For the reasons indicated above it is our opinion that the appellee has failed to meet the burden cast on her to establish her case, and a reversal of this case must follow. It is so ordered.

Reversed and remanded.