MILES *v.* REVIEW BOARD OF THE INDIANA EMPLOYMENT
SECURITY DIVISION ET AL.

[No. 18,109. Filed January 15, 1951.]

*Burchard R. Davidson* and *Leslie Duvall,* both of Indianapolis, for appellant.

*J. Emmett McManamon,* Attorney General, *James A. Watson,* Deputy Attorney General, and *Glen F. Kline,* Chief Counsel, Indiana Employment Security Division, for appellees.

ROYSE, J.—This case presents for our determination the question of whether there was sufficient evidence to sustain the finding of the Review Board of the Indiana Employment Security Division (hereinafter referred to as the Board) that appellant was not entitled to benefits of the Indiana Employment Security Act for the period from January 16, 1950 to April 14, 1950 because he "was not available for work," as defined in said Act.

The applicable provision of the statute provides as follows:

> "An unemployed individual shall be eligible to receive benefits with respect to any week only if: He is physically and mentally able to work *and is available for work:* Provided, That if an otherwise eligible individual is unable to work or is unavailable for work on any normal work day of the week he shall be eligible to receive benefits with respect to such week reduced by one-third of his weekly benefit amount for each day of such inability to work or unavailability for work . . ." (Acts 1947, ch. 208, § 1403, p. 673, 702; Burns' 1933 (1949 Supp.), Section 52-1538b. (Our emphasis).

The evidence upon which the Board made its finding and decision is based primarily upon the testimony of

appellant before the Referee of the Board. We set out in full the condensed recital of that evidence contained in his brief.

"My name is George Miles and at the present time I live at Rural Route No. 1, Ft. Myers, Florida. I formerly resided at Indianapolis, where I was employed by the Indianapolis Varnish Company, Inc. I was discharged by the Company on January 1, 1950.

"I moved to Florida about eighteen months before being discharged by the Varnish Company. During this time I served in a consulting capacity to that company. I gave it any information it wanted on accounts and on running tests. This was the work which I had previously done in Indiana. My business was conducted by mail, although I did make one trip back to Indiana.

"I served as president and general manager of the Company from 1933 until 1945. After that time I continued in a consulting capacity, and also handled five or six accounts for the company. This company manufactures paints, varnishes, and lacquers.

"I am a chemist with thirty years experience in the paint industry. From 1933 until 1945 I was the president and general manager of the varnish company. In 1945 the company was sold, but I continued in a consulting capacity, and handled five or six accounts until my discharge on January 1, 1950.

"From the time I went to Florida in July of 1948 until my severance from the company I continued on a straight salary basis. From 1945 until 1948 I had been on a salary and commission basis. My income was $12,306.12 in 1946, in 1947 it was $15,066.18, in 1948 $12,530.15, *and in 1949 it was $1500.* During 1949 I was not on a commission basis.

*"I moved to Florida for the purpose of making it my permanent residence, and I have resided there ever since.*

"Since moving to Florida I have made an effort to find employment. I talked to the vice-president

of a Ft. Myers bank, and to a man in the insurance business, about the employment openings.

"The Employment Service made no endeavor to find me work. They never gave me any references.

"Ft. Myers is about 150 miles south of Tampa. It has a permanent population of 20,000. The industries are fruit, potato raising, and shrimping. Ft. Myers is primarily a resort town like all Florida. The winter population of Ft. Myers is about 30,000. The city is on the Atlantic Coast Railroad Line, and the Seaboard also goes through. Ft. Myers is also a seaport, but there is no heavy shipping.

"*When I filed my claim in Florida I informed the claim taker that I was seeking employment running an office, an executive job, or something that paid a fairly good wage.* They said they had nothing available then but digging potatoes. I told them that was out. I told them that I should have an income of $500 per month, but I did not restrict myself to that amount. *Later I cut this back to $300, on or about February 20, 1950, providing the job was comparable to the work I had been doing.*

"I am fifty-nine years of age, and I have been in the paint business most of my life. Before going to the army I was president of a furniture plant in Shelbyville. After my discharge in 1917 I was with the Indianapolis Varnish Company until 1921. Then I went with Lilly Varnish Company and worked there at an average salary of $10,000 until 1928. From 1929 until 1932 I lived on a farm. When the Indianapolis Varnish Company went into receivership in 1932, the Indiana National Bank asked me to take over as general manager. From 1933 until 1945 I was president. In 1945 I sold the capital stock of Indianapolis Varnish, which I had previously acquired, and resigned as president. I agreed, however, to stay on two years to handle certain accounts.

"When I inquired about work in Ft. Myers I was told that they didn't think there were any prospects of employment, and I looked for something to offer me self-employment. *I have made no inquiry or investigation as to the possibility of employment outside of my line.*

"I would take employment elsewhere in Florida at a salary of $500 per month, and traveling expenses.

"My wife lives with me in Florida. *I expect to stay there regardless of whether or not I obtain suitable connections.*

"An opening comes up once in a while for employment. There was one last year I could have had, but that position is gone.

"I am not available for common labor, for I wouldn't be physically able at my age.

*"I wouldn't do clerical work like working in a store. However, I would do work as a clerk with a firm, if the salary was $300 to $500 per month.*

"My principal qualifications is as an expert in the manufacturing of paints, varnishes, and lacquers, but I can also manage any business, break down any reports, or anything of that sort. Any kind of executive job. I can run any kind of business. It wouldn't have to be particularly the varnish business." (Our emphasis).

Upon this evidence the Board, in affirming the decision of the Referee, held appellant was unavailable for work and ineligible for benefits for the above mentioned period. We may not disturb this decision unless reasonable men would be bound to reach a different conclusion on the evidence in the record.

In the case of *Walton* v. *Wilhelm et al.* (1950), 120 Ind. App. 218, 91 N. E. 2d 373, 375, this court said:

"The phrase 'available for work' is not defined by statute, nor are we able to formulate a definition thereof which will serve as an infallible guide. Whether an individual is 'available for work' within the meaning of our statute must necessarily depend in each case upon the facts and circumstances surrounding that case, considered *against the background of the purposes of the legislation and the objectives at which it aims. . . .*

"We think availability involves an actual attachment to the labor force. A good faith offering of the claimant's services is a prerequisite to availability. *Exposure to the labor market must be sincere and unequivocal.* A professed willingness to work, accompanied by or following conduct wholly inconsistent therewith, will not serve to establish availability. *Good faith cannot exist independently of honest intention."* (Our emphasis).

In 55 Yale Law Journal, p. 124, Louise F. Freeman, says:

"The availability requirement is said to be satisfied when an individual is willing, able, and ready to accept suitable work which he does not have good cause to refuse, that is, when he is genuinely attached to the labor market. Since, under unemployment compensation laws, it is the availability of an individual that is required to be tested, the labor market must be described in terms of the individual. A labor market for an individual exists when there is a market for the type of services which he offers *in the geographical area in which he offers them.* 'Market' in this sense does not mean that job vacancies must exist; the purpose of unemployment compensation is to compensate for the lack of appropriate job vacancies. *It means only that the type of services which an individual is offering is generally performed in the geographical area in which he is offering them."* (Our emphasis).

In *Bliley Electric Co.* v. *Unemployment Comp. Bd. of Review* (1946), 158 Pa. Super. 548, 560, 45 A. 2d 898, 905, the court, speaking on this question, said:

"There is no requirement in the quoted section, nor elsewhere in the act, that a claimant shall be available for work in any particular place, such as the locality in which he earned his wage credits or where he last worked or resided. The mere fact that a claimant has moved from one locality to another does not create a basis for holding him

unavailable for work. If he registers for work in the new locality, and *labor-market conditions there afford reasonable opportunities for work,* he is available for work. Even if it appears that he might more readily have been employed had he remained in his former locality, he is nevertheless available for work *if he is willing to take work for which opportunities exist in the new locality.*

"Nor does our statute, differing in this respect from those of other states, require that the employe shall be available for full-time work, or for permanent, as distinguished from temporary, employment. So long as the claimant is ready, willing and able to *accept some substantial and suitable* work he has met the statutory requirements. By the same token, the availability rule does not necessarily require that a claimant be available for his most recent work or his customary work. It is sufficient if he is able to do some type of work, and there is reasonable opportunity for securing such work in the vicinity in which he lives. So, an unemployed worker is not justified in refusing part-time or temporary work, *nor work for which he has not been trained but which he is able to perform."* (Our emphasis).

See also, *Shellhammer* v. *Unemployment Compensation Board of Review* (1948), 162 Pa. Super. 327, 57 A. 2d 439.

The foregoing authorities announce the rules which have been generally followed in the states whose statutes contain substantially the same provision as Indiana on the subject of availability. We are of the opinion these rules are in accord with the social-economic objectives of the Indiana Employment Security Act.

Based on the testimony of the appellant, it seems clear to us he went to Ft. Myers, Florida for purely personal reasons which had nothing to do with his work for his Indiana employer. He intends to live there regardless of the job opportunities it affords. He knew the labor market there did not

offer reasonable opportunity for the type of work he had been accustomed to perform. When he filed his claim he put such unreasonable restrictions on the kind of work he would accept that it indicated he was not *conscientiously* making himself available for work. It is significant that he stated he would not accept work which did not pay him more than double the salary he received in the last year of his work for the Indiana employer.

In our opinion the Legislature did not intend the benefits provided by the Indiana Employment Security Act should extend to a person who voluntarily placed himself in the position of the appellant herein.

We are of the opinion there is ample evidence to sustain the decision of the Board.

There is no merit to appellant's contention that it is the duty of the Board to determine what is "suitable work" for the claimant before the Board can determine whether he was "available for work."

Decision of the Board affirmed.

NOTE.—Reported in 96 N. E. 2d 128.