## Williams Unemployment Compensation Case.

Argued June 15, 1960. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONT-GOMERY, JJ.

*Christopher T. Powell,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Anne X. Alpern,* Attorney General, for Unemployment Compensation Board of Review, appellee.

OPINION BY WATKINS, J., September 20, 1960:

In this unemployment compensation case the claimant was denied benefits under the provisions of §402(b) of the Unemployment Compensation Law, 43 PS §802(b), on the ground that he voluntarily terminated his employment by failure to pay certain union dues.

Benefits were denied by the Bureau of Unemployment Compensation but on appeal, the referee reversed the bureau and awarded benefits. The Unemployment Compensation Board reversed the referee, denying benefits, and this appeal followed.

The claimant, William J. Williams, was last employed by Haddon Craftsman, Inc., Scranton, Pennsylvania. He was laid off for lack of work on March 28, 1958, and placed on a recall list. At that time he was a member in good standing of the Brotherhood of Bookbinders, Local 97, the bargaining agent for the plant. Employes on a non-working status did not have to pay local union dues but were required by the union agreement to pay the $1.05 monthly tax to the International Union which was collected by the local union. The International Union's by-laws provided that failure to pay the $1.05 tax by the tenth of the month would incur suspension, but if the member paid the dues by the thirtieth of the month, automatic reinstatement would follow. The Local Union's by-laws, however, provided for suspension for failure to pay without any grace period; that the suspended member lost his seniority; and in order to obtain reinstatement must pay a fine equal to 50 hours of pay.

The record shows that the claimant offered to pay the per capita international tax after being in default, before the thirtieth of the month, but the local union refused to accept it, demanding the full penalty required by the local by-laws, before permitting reinstatement. The claimant testified he could not afford to pay the penalty amounting to $61.73. Up to the time of the hearing of this case no work was available for this claimant to effect his recall but as the employer refused to rehire him unless he was reinstated, his name was removed from the recall list and his employment terminated as of April 16, 1958.

I think it is necessary to review our decisions in regard to the union dues cases under §402(b), supra, in the light of the *Gianfelice Unemployment Compensation Case,* 396 Pa. 545, 153 A. 2d 906 (1959), where the Supreme Court of Pennsylvania held that where a statute of the Commonwealth expresses a public policy designed to alleviate a condition of possible distress among the public or a segment thereof and explicitly proscribes waiver of the benefits of the act, no private agreement, however valid between the parties, can operate as a waiver. In that case, Mr. Justice COHEN in a learned opinion, said at page 552: "Moreover, we believe that the labor-management agreement cannot govern our determination in this case for another reason. The Unemployment Compensation Law was enacted to alleviate the hardships attendant upon unemployment. Act of December 5, 1936, P. L. (1937), 2897, §3, 43 PS §752; McFarland v. Unemployment Compensation Board of Review, 158 Pa. Superior Ct. 418, 45 A. 2d 423 (1946). It is a remedial statute designed to provide support for workers who are unemployed except for those disqualified by one of the specific provisions of §402. Sturdevant Unemployment Compensation Case, 158 Pa. Superior Ct. 548, 559, 45 A. 2d 898 (1946). In furtherance of this policy, the General Assembly included §701, 43 PS §861, in the law.[3] This provision renders invalid any agreement by an employee to waive or release any of his rights under the act. It is our view that if the labor-management agreement were able to be relied upon to disqualify Gianfelice as a 'voluntary quit' when his separation from work was not in fact voluntary, the agreement would be invalid to such extent."

---

"[3] Section 701 declares: 'No agreement by an employe to waive, release, or commute his rights to compensation, or any other rights under this act, shall be valid.'"

The claimant is clearly an unemployed person for whom this legislation was designed to protect. There is no question that he was entitled to benefits at the time he was laid off but by virtue of the collective bargaining agreement and its dues paying and reinstatement requirements, the employer terminated the employment relationship and the Unemployment Compensation Board determined that he was a "voluntary quit".

In view of the *Gianfelice* decision, supra, we think this is error and find it necessary to re-examine our decisions involving the payment of union dues. We held in *O'Donnell Unemployment Compensation Case,* 173 Pa. Superior Ct. 263, 98 A. 2d 406 (1953), where the employe was dismissed for failure to maintain his union membership by the payment of a reinstatement fee of $25 required after the member was delinquent for more than sixty days that, "She was responsible for the situation, which could have been reasonably avoided, but which forced her employer to dispense with her services . . . An employe is bound to exercise reasonable diligence in the conduct of his own affairs. 'It seems entirely reasonable to hold that a claimant who neglects to take those precautions to guard his job, which a reasonably prudent person would take, . . . in effect leaves his employment voluntarily': Vernon Unemployment Compensation Case, 164 Pa. Superior Ct. 131, 135, 63 A. 2d 383, 384." However, in this case we said further, at page 266: "There may be circumstances in which a union's demands upon an employe are so severe and unreasonable as to constitute good cause for leaving his employment." If reasonableness of the union's demands is the test, then clearly the instant case presents the unreasonable situation of two divergent by-laws, in which the claimant complied with one and not the other, and an outrageous

penalty of loss of seniority and a fine of $61.73 for two days dues delinquency.

In the *Wallace Unemployment Compensation Case,* 187 Pa. Superior Ct. 618, 145 A. 2d 902 (1958), we somewhat modified our position in the *O'Donnell* case, supra, and held that a claimant who refused to join a union was not barred from benefits as a "voluntary quit" unless he had knowledge that the employer operated a closed shop when he applied for work and joining the shop union was made a condition of his employment in the contract of hiring.

However, in the *Butler Unemployment Compensation Case,* 189 Pa. Superior Ct. 605, 151 A. 2d 843 (1959), we clearly overruled the *Wallace* case, supra, by holding that: "We are now definitely ruling that a claimant who fails or refuses to join or remain a member of a bona fide labor organization, as a condition of continuing in employment under the contract between such organization and employer, does not have a cause of a necessitous and compelling nature for leaving his work." We decided this case on the basis of the language contained in §402(b), supra, which says, inter alia, "That no employe shall be deemed to be ineligible under this subsection where as a condition of continuing in employment such employe would be required to join or remain a member of a company union or to resign from or refrain from joining any bona fide labor organization." In view of the now established rule of the *Gianfelice* case, supra, and after a careful examination of the above language contained in the act in question, I am unable to read into this language a legislative intention to deny benefits to an employee as a "voluntary quit" for failure to meet the terms of a collective bargaining agreement and so create the hardship this act was intended to alleviate.

By ruling "that a claimant who fails or refuses to join or remain a member of a bona fide labor organization as a condition of continuing in employment under the contract between such organization and employer, does not have a cause of a necessitous and compelling nature for leaving his work", this Court goes far beyond the intent of the legislature.

As there has been no substantial change in this language since its original enactment (See Act of 1936, 2d Ex. Sess. December 5, P. L. (1937), 2897, Art. IV, §402) we should remember that it was at this time that the real organizational effort by the unions began. One of the weapons used by employers at that time to combat unionism was the so-called company union. Workers were forced to join the company union and denied the right to join any other. This union was entirely controlled by the employer so that collective bargaining, as such, was non-existent but the employer would announce that he had a union shop.

It is, of course, possible to have an association of workers of a single plant, independent of any national labor group constitute a labor organization under the law, so long as it is not administered and dominated by the employer. This is usually called an "independent union" but is sometimes called a "company union" or "shop union", and although it seems a contradiction of terms, if the "company union" in fact is so named because it is confined to a shop or plant, and is not administered, controlled and dominated by the employer, it could constitute a legal labor organization. "The term 'labor organization' shall mean every organization of employes, not dominated or controlled by any employer or any employer organization . . .", 1937 June 2, P. L. 1198, §3, 43 PS §206c(j).

But the legislature in writing §402(b), supra, makes a clear distinction between "bona fide labor or-

ganization" and "company union" and the crux of the distinction is that the employer is the actor forcing the employe to join or remain a member of the "company union" or forcing the employe to resign or refrain from joining the "bona fide union". So that "company union" as used in the act could not constitute a labor organization under the law. The very use of the words "bona fide" and "company" indicate this clearly.

Although the public policy of the Commonwealth encourages membership in labor organizations, the Act of 1937, June 1, as amended, provides, inter alia, "It shall be an unfair labor practice for an employer—(c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization:" 1937, June 1, P. L. 1168, §6, as amended, 43 PS §211.6(c). This, despite the fact that a union agreement, the result of collective bargaining, may provide membership in the union as a condition of employment and thus create a closed shop. The claimant is, of course, bound by the agreement as to his employment. But the action of the employer in making the failure of the claimant to maintain his membership in the union a forfeiture to his right to unemployment compensation is an attempt on his part to encourage membership in the union, and so in violation of the law against unfair labor practises. The collective bargaining agreement may control his right to work in the closed shop but not his right to unemployment benefits.

In *Barclay White Co. v. Unemp. Comp. Bd.*, 356 Pa. 43, 50 A. 2d 336 (1947), the Supreme Court held that a claimant is not entitled to benefits when he refuses a reference to work in an open shop for the reason that it will result in his suspension or expulsion

from his union. Mr. Justice DREW, in discussing the language of the legislature which we have under consideration, said at page 47, "He was not required by Sun Company to join a company union or resign from, or refrain from joining a labor organization. The language 'condition of being employed, the employe would be required . . . to resign from . . . any . . . labor organization', . . . obviously refers to a condition, in the offer of employment made by the employer, requiring the prospective employe to resign from a labor organization: . . . Where, however, the offer of the employer is unconditional, it was not intended that the employe be eligible for compensation where he refuses the proffered position merely because of a condition imposed on him by others."

The individual workman theoretically has the right to join or not to join a union. The union has the right to use every legal method to organize workers. The legislature recognized the use of the "company union" as a method to combat unionism and, insofar as unemployment benefits were concerned, used the language contained in this section to protect the benefits of the workmen, who were victims of such a practice, by making such unemployment one of the exceptions for voluntarily leaving work. This protection was not for the employer or for the union but for the workmen. It was certainly not the intent of the legislature, nor does the language convey such an intent, that in attacking the evil created by the employer's zeal to destroy unionism, the Commonwealth should join hands with the bona fide union's organizing effort, and so create another situation effecting the free choice of the workman by forcing him to join the union in order to qualify for benefits and so make the union agreement a vehicle to destroy the public policy of the legislature to alleviate possible distress as a result of unemployment.

The purpose of the language of the subsection in question was to make it possible for any employe to refuse employment or leave employment without being a "voluntary quit", where such employe, for reasons of his own, did not want to accept conditions of employment set by his employer (because the organization is a company union, the so-called union and the employer are one and the same) that required him to join a company union or remain a member of a company union and which prohibited him from resigning from a company union and from joining and remaining a member of a bona fide union. The evil in 1936 was created by the employer as a weapon to fight unionism and the language was drawn to cover the evil.

The union agreement is not a condition laid down by the employer. Its terms have been arrived at by collective bargaining between the union and management so that its contractual terms could not possibly have been included in the purpose of the subsection dealing with company unions and conditions of employment imposed by the employer. There is no question that the agreement is binding between the parties and that his unemployment was due to his delinquency under the agreement. But under the now established rule of the *Gianfelice Unemployment Compensation Case,* supra, where the claimant's unemployment was also due to the agreement, it is not possible to reach out and make his contractual delinquency a forfeiture to his right to benefits under the law designed to alleviate unemployment, and to make what is patently an involuntary separation from work a "voluntary quit".

As Justice COHEN said in the *Gianfelice* case, at page 551: "This is one reason why the collective bargaining agreement should not control in determining the eligibility of a retired employee for unemployment

compensation; rather, the factual matrix at the time of separation should govern. This was the position taken by Judge (now Justice) BRENNAN in Campbell Soup Co. v. Board of Review, 13 N.J. 431, 100 A. 2d 287 (1953), wherein the New Jersey Supreme Court found the claimant eligible for benefits. Viewed in this light, the questions here become simply (1) did Gianfelice cease working voluntarily as a matter of fact, and (2) was Gianfelice available for work thereafter? Since the answers on the record are (1) no, and (2) yes, Gianfelice is entitled to benefits."

If we were to ask the same questions in our instant case, (1) did Williams cease working voluntarily as a matter of fact, and (2) was Williams available for work thereafter?, the answers on the record are (1) no, and (2) yes, and Williams is entitled to benefits.

The decision of the Unemployment Compensation Board of Review is reversed.

WRIGHT, J., concurs in the result.

---

CONCURRING OPINION BY MONTGOMERY, J.:

I readily concur not only for the reasons stated in the opinion of Judge WATKINS but for the additional reason that the Bylaws of the Local Union must give way to the Bylaws of the International Union on the point involved. *Riverside Lodge No. 164 et al. v. Amalgamated Association of Iron, Steel and Tin Workers of North America et al.*, 13 F. Supp. 873. The latter gives the right to automatic reinstatement if the International's monthly assessment is paid within thirty days. The claimant in this case tendered the assessment within that period. Since the Local Union was acting merely as the agent for the International in collecting these assessments, its effort to take away the

right of automatic reinstatement and impose an unreasonable fine for that privilege would be void, in my opinion.

For that reason, the claimant was in good standing and not in a "voluntary quit" status when he was denied re-employment. The unauthorized act of the Local as agent for the International in refusing to accept his payment could not have the effect of disqualifying him for re-employment.